Filed 1/16/19; Certified for Publication 2/14/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FERNANDO JIMENEZ-SANCHEZ et al., | F072599 |
| Plaintiffs and Appellants, | (Super. Ct. No. VCU255684) |
| v. | |
| DARK HORSE EXPRESS, INC., | **OPINION** |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Tulare County. Lloyd L. Hicks, Judge.

Mallison & Martinez, Marco A. Palau, Eric Trabucco and Stanley Mallison for Plaintiffs and Appellants.

Klein, DeNatale, Golder, Cooper, Rosenlieb & Kimball, Catherine E. Bennett; Krase, Bailey, Reed-Krase and Allan M. Bailey for Defendant and Respondent.

-ooOoo-

The named plaintiffs, former employees of defendant, brought this action asserting wage and hour claims on behalf of themselves and other similarly situated employees of defendant. The trial court denied plaintiffs' motion for class certification. Plaintiffs appeal, asserting the claims of the proposed class are based on statutory and regulatory

requirements and uniform policies of defendant, which present predominantly common issues of law and fact suitable for determination on a class basis. They contend the trial court's decision was based on improper legal criteria and erroneous legal assumptions and was unsupported by substantial evidence. We conclude that, in denying the motion for class certification, the trial court used improper criteria or erroneous legal assumptions, which affected its analysis of whether plaintiffs' claims and one of defendant's defenses presented predominantly common issues, suitable for determination on a class basis. Accordingly, we reverse and remand for a redetermination of the motion.

### FACTUAL AND PROCEDURAL BACKGROUND

This action was filed as a class action. The operative pleading names two plaintiffs, Fernando Jimenez Sanchez and Porfirio Preciado. It alleges they brought this action as a class action, on behalf of themselves and all other similarly situated current and former employees of defendant who worked as drivers. Defendant is a trucking company and plaintiffs were employed as drivers to transport milk within California; they were paid on a piece-rate[1] basis for driving and at a contractual rate for certain other activities. Plaintiffs allege defendant enforced policies that: imposed a piece-rate system that failed to compensate employees for all "hours worked," as defined by law; failed to authorize or permit rest breaks by not separately compensating for them at an hourly rate; failed to schedule meal periods, provide uninterrupted duty-free meal periods of at least 30 minutes, or pay employees for on-duty meal periods; failed to pay premiums when rest or meal breaks were not provided; failed to maintain accurate records of employee time; failed to provide accurate wage statements; and failed to pay all wages owed upon termination of employment. Plaintiffs assert causes of action for: (1) failure to pay at

---

[1] A piece-rate system compensates employees according to tasks performed rather than hours worked.

2.

least minimum wage or the contractual rate for all hours worked, including "nonproductive time"; (2) failure to provide rest periods or premium wages in lieu of them; (3) failure to provide meal periods or premium wages in lieu of them; (4) failure to provide accurate wage statements; (5) failure to timely pay wages due at termination; and (6) violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

Defendant identified 76 current and former drivers as potential class members. It obtained settlement agreements and releases of the claims asserted in the lawsuit from 54 of those drivers. It produced a list of the 76 drivers to plaintiffs in discovery responses in December 2014; it also produced copies of all but two[2] of the releases to plaintiffs in October and December of 2014.

Plaintiffs filed a motion for class certification. They proposed certification of a class defined as: "All current and former California based Dark Horse drivers who are or have been paid on a piece rate basis at any time from March 25, 2010 to present." Plaintiffs also proposed two subclasses: (1) drivers within the class who did not sign settlement or release agreements; and (2) drivers within the class who signed a purported settlement and release of claims. Plaintiffs asserted the class was numerous and ascertainable, and would support class action treatment of the case.

Plaintiffs argued common issues that could be determined on a class basis predominated. All drivers within the proposed class were paid on a piece-rate basis for each load delivered, but were not separately compensated for certain work activities, "including rest breaks, vehicle inspections, truck washing, delays that are beyond driver control and other activities." Plaintiffs contended defendant had a uniform policy of including compensation for rest breaks in the piece-rate formula, but that practice was unlawful under *Bluford v. Safeway Inc*. (2013) 216 Cal.App.4th 864 (*Bluford*). They also

---

[2] The remaining two releases were obtained by defendant after the others were produced in discovery.

3.

asserted defendant's policy of not separately compensating drivers for nondriving tasks "not incidental to the piece rate," including vehicle inspections, truck washing, time spent waiting for trucks to be loaded or unloaded, and the return trip to defendant's yard, violated a rule set out in *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36 (*Gonzalez*). Plaintiffs further contended defendant had a policy of not providing timely meal periods or meal periods free from work obligations. Because of all of these violations, plaintiffs assert the itemized wage statements provided by defendant were inaccurate, in violation of statute. Finally, they argued the settlement and release agreements were invalid, either because they were prohibited by statute or because they were unconscionable, or both.

Defendant opposed the motion for class certification. It argued 54 potential class members had released their claims, leaving only 17 potential class members, other than the named plaintiffs and the four individuals who provided declarations in support of plaintiffs' motion. It contended the class was not sufficiently numerous to warrant a class action. Further, because most of the potential class members expressed through their releases a lack of interest in pursuing the litigation against defendant, plaintiffs' claims were not typical of the class and were antagonistic to the interests of the majority of potential class members.

Defendant also asserted the proposed class included a number of different types of drivers, whose work involved different tasks and who were paid by different pay formulas.[3] It argued the pay formula and tasks included in the piece rate for each driver depended upon the individual driver's employment agreement with defendant, so evidence regarding each individual's contract would be required. Defendant asserted it

---

[3] The 76 drivers identified included: cattle haulers, Cargill drivers, who shipped loads for Cargill, drivers who hauled milk for California Dairies, Inc. (CDI), drivers who hauled milk for Dairy Farmers of America (DFA), commodities haulers, hay drivers, flat bed drivers, and a floater, who could do any kind of driving. Both named plaintiffs were milk drivers, primarily for Dairy Farmers of America.

4.

had no uniform written policy regarding meal breaks, and in fact drivers were allowed to take rest and meal breaks whenever they needed them. Finally, defendant argued the validity of the releases depended on individualized facts regarding the circumstances under which each potential class member was asked to sign and agreed to do so.

The trial court denied plaintiffs' motion, primarily on the ground individual issues predominated over common issues capable of determination on a class basis. Plaintiffs appeal from the denial of the class certification motion. They contend the trial court used improper criteria or erroneous legal assumptions in reaching its decision, and therefore abused its discretion in denying the motion.

**DISCUSSION**

## I. Standard of Review

"The denial of certification to an entire class is an appealable order." (*Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 435 (*Linder*).) "On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order … the existence of every fact the trial court could reasonably deduce from the record … .' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 (*Brinker*).)

5.

"[A]ppellate review of orders denying class certification differs from ordinary appellate review.  Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct.  [Citation.]  But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness."  (*Hendershot v. Ready to Roll Transportation, Inc*. (2014) 228 Cal.App.4th 1213, 1221 (*Hendershot*).)  In reviewing "an order denying class certification, we consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial."  (*Bufil v. Dollar Financial Group, Inc*. (2008) 162 Cal.App.4th 1193, 1205 (*Bufil*).)

## II.     Standards for Class Certification

"Code of Civil Procedure section 382 authorizes class actions 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court … .'  The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members.  [Citations.]  The 'community of interest' requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).)  "In addition, the assessment of suitability for class certification entails addressing whether a class action is superior to individual lawsuits or alternative procedures for resolving the controversy."  (*Bufil*, *supra*, 162 Cal.App.4th at p. 1204.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'  [Citation.]  A trial court ruling on a certification motion determines 'whether … the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to

6.

the litigants.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 326.) "[I]n determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Id*. at p. 327.) "Predominance is a comparative concept, and 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.' [Citations.] Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Id*. at p. 334.)

" 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.… [T]o determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.' " (*Ali v. U.S.A. Cab Ltd*. (2009) 176 Cal.App.4th 1333, 1347.) "[T]here is no precise test for determining whether common issues predominate, and thus ' "the court must pragmatically assess the entire action and the issues involved." ' " (*Id*. at p. 1351.)

### III. Trial Court's Ruling

Defendant is a trucking company that transports agricultural products, including cattle, milk, compost, sack feed, and equipment. The trial court noted defendant asserted the drivers fell within a number of different categories. The evidence indicated the 76 individuals defendant identified as drivers employed during the class period included: "11 cattle haulers; two Cargill drivers who shipped loads for Cargill; 17 milk drivers who hauled milk for the California Dairies, Incorporated co-op; 22 milk drivers who hauled milk for the Dairy Farmers of America co-op; 18 drivers who hauled commodities; two hay drivers; three flat bed drivers; and one floater … who could be expected to do any kind of driving."

In its ruling, the trial court stated the primary issue in the case is the validity of the pay formulas, and the validity of the releases (also a major issue) turns on the validity of the pay formulas. Addressing the issue of the settlement and release agreements, and the claims of the putative subclass members who signed releases, the trial court rejected plaintiffs' assertion that "the releases are categorically invalid because Labor Code [section] 206.5[4] prohibits a release of wages due unless they are paid in full." It concluded it must still determine what wages were "due," and that depends on the employment agreements between the parties.

Whether the tasks plaintiffs characterized as "nonproductive time" and rest breaks were included in, or incidental to, the activities for which the piece work payment was made was a question still to be determined, and its resolution would depend on the terms of each driver's employment agreement with defendant. As the trial court put it, "If, as [d]efendant alleges here, the terms agreed upon by each driver and [d]efendant company (represented by different people who hired drivers) is that the job will be to do all work associated with hauling a load from point A to point B, including, by way of example, pre-inspection; fueling; loading; waiting to load; unloading; waiting to unload; post inspection and cleanup and breaks, and that the pay for that scope of work will be determined by a formula consisting of any of the methods here, then there is no uncompensated work time involved, and no unpaid wages due." The trial court concluded plaintiffs had not shown how the issue of the terms of each driver's employment agreement could be determined on a class-wide basis, without inquiry of each driver, and it did not appear that could be done. Additionally, other defenses to the releases, such as duress or improper inducement, involved "purely individual issues."

As to the remaining drivers—the subclass of drivers who did not sign releases— the trial court found plaintiffs presented no evidence regarding what categories the

---

**4**     All further statutory references are to the Labor Code, unless otherwise indicated.

drivers fell within and no trial plan showing how their issues could be resolved on a class basis. Also, plaintiffs failed to show the remaining drivers were sufficiently numerous to make class treatment preferable.

The trial court found "[t]he meal break issue would, but for the releases, be capable of determination on a class basis as a common issue of law, but … these would be covered if the releases are valid." There was also a question regarding whether federal preemption affected the claims of the interstate drivers. The trial court concluded: "Given the paucity of common issues capable of being determined on a class basis, and the lack of information as to the potential numbers of actual persons in the numerous categories, a class action is clearly not the superior method of adjudication [of] the claims in this action."

## IV. Whether Common Questions of Law or Fact Predominate

Plaintiffs contend defendant applied uniform wage and break policies to its drivers, so their claims raise predominantly common questions of law and fact, making this case suitable for class treatment. They contend the law requires that, if an employee is paid on a piece-rate basis, the employee must be compensated for rest breaks and nonproductive time separately from the piece rate. Plaintiffs assert defendant's person most knowledgeable testified that compensation for breaks and the for the time plaintiffs described as nonproductive was included in the piece rate. The trial court found the drivers' contracts with defendant were not uniform, and plaintiffs' claims gave rise to individual issues regarding what was included in each driver's employment contract, and what specific tasks were to be compensated by the piece rate, which made these claims unsuitable for class determination. Plaintiffs contend the trial court's conclusion rests on improper criteria and erroneous legal assumptions, including the assumption that the employment contracts lawfully could provide that compensation for rest breaks and nonproductive time was included in the piece rate. Therefore, plaintiffs conclude, it was an abuse of discretion to deny class certification on the ground the content of the drivers'

9.

employment contracts presents individual questions that are not suitable for determination on a class-wide basis.

The trial court found the meal break claims would present common issues, but for the releases. Plaintiffs contend that conclusion erroneously rested on an adjudication that the releases are valid, and such an adjudication of the merits of the defense is inappropriate in deciding the issue of class certification.

Plaintiffs also contend the proposed subclass of employees who signed settlement and release agreements signed identical agreements. They assert the releases were all void pursuant to statute. Therefore, the issues presented by the releases were common to all members of the subclass, and class treatment would be the best means of adjudicating the validity or invalidity of the releases.

### A. Compensation for "nonproductive" time

Plaintiffs claim defendant's piece-rate formulas failed to separately compensate drivers for "nonproductive time," and this violated the requirement that employees be compensated for all hours worked at either minimum wage or the agreed contractual rate. They contend there is a common question regarding "whether [defendant] is required by California law to pay drivers separately for tasks not directly compensated by the piece rate," and this "legal question can be answered on a class wide basis by analyzing [section] 226.2, the Wage Order and case law."

#### 1. Wage order

The wage order cited by plaintiffs applies to "all persons employed in the transportation industry" and requires that every such employee be paid "not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." (Cal. Code Regs., tit. 8, § 11090 subd. (1), (4)(B).) "Hours worked" is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (Cal. Code Regs., tit.

8, § 11090 subd. (2)(G).) Thus, the regulation permits piece-rate payment, as long as the employee is paid at least minimum wage for all hours worked.

### 2. Section 226.2

Section 226.2 provides, in relevant part:

"This section shall apply for employees who are compensated on a piece-rate basis for any work performed during a pay period.… For the purposes of this section, … 'other nonproductive time' means time under the employer's control, exclusive of rest and recovery periods, that is not directly related to the activity being compensated on a piece-rate basis.

"(a) For employees compensated on a piece-rate basis during a pay period, the following shall apply for that pay period:

"(1) Employees shall be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation." (§ 226.2.)

Plaintiffs contend this section required defendant to pay the proposed class separate compensation, in addition to the piece rate, for "tasks not directly compensated by the piece rate, such as pre and post-trip [vehicle] inspections, washing trucks, delays [caused by backups at facilities], driving to the yard after completing the final load, completion of paperwork, and attending annual review meetings, among other tasks." Because defendant admitted it did not separately compensate its drivers for the listed items, plaintiffs assert the only question is whether defendant was required to compensate the drivers separately for the listed items, which is a common legal question that can be answered simply by looking at this statute and case law.

One problem with plaintiffs' argument is that section 226.2 did not exist at the time the class claims arose or at the time the trial court ruled on the motion for class certification. The motion was filed on July 13, 2015, and defined the class as current and former drivers "from March 25, 2010 to present." The trial court issued its ruling denying the motion on September 3, 2015. Section 226.2 did not take effect until January

11.

1, 2016. (Stats. 2015, ch. 754, § 4.) Plaintiffs provide no argument or analysis regarding whether or how the statute would apply to the claims of the proposed class.

A second problem is that, even if section 226.2 would apply to the class claims, plaintiffs' argument simply assumes, without evidence or analysis, that the listed items could not be compensated by the piece rate, because they were "nonproductive time" that was "not directly related to the activity being compensated on a piece-rate basis." Plaintiffs presented no evidence that defendant's employment agreement with any of the drivers provided that the activity being compensated on a piece-rate basis was only driving, or excluded the listed items. William Petty, defendant's vice-president and general manager, declared that, when he hired a driver, he explained the driver would be paid "for completing all tasks required to complete the loads and to return the vehicle to [defendant's] yard. These included tasks such as, inspecting, filling out paperwork, sampling, loading and unloading, and fueling." The driver declarations presented by defendant declared the drivers' understanding that the piece-rate payment compensated them for performing all duties necessary to complete the load and return the truck to the yard at the conclusion of the load. Jimenez Sanchez testified he understood he would be paid by the trip or load; he was expected to make three trips, loading the truck, taking it to the plant, and unloading it. In doing these tasks, he would have to perform vehicle inspections, fill out paperwork, fuel the truck, and wait at the dairy or creamery. He had no understanding he would be paid separately for time spent on these activities. Preciado also testified he was paid by the load, and did not have an understanding he would be separately paid for inspections, completing paperwork, washing the truck, or waiting at dairies.

Thus, even if section 226.2 applies to plaintiffs' claims, the trial court correctly determined that questions concerning whether time spent on items such as inspections, completing paperwork, waiting at dairies or creameries, and returning to the yard constituted "nonproductive time" must be answered by reference to the employment

12.

agreements between defendant and the drivers. Plaintiffs failed to demonstrate there was any class-wide agreement for all categories of drivers (milk drivers and other drivers), or that the drivers' employment agreements defined the tasks compensated by the piece rate to exclude inspections, wait time, and the other activities plaintiffs classify as "nonproductive time."

### 3. *Gonzalez v. Downtown LA Motors, LP*

Plaintiffs also base their claim for compensation for nonproductive time on *Gonzalez, supra,* 215 Cal.App.4th at page 36. In *Gonzalez*, the employer compensated its automotive service technicians (the plaintiff class) on a piece-rate basis for each repair job completed. (*Id*. at p. 41.) When there was no repair work because of a lack of customers, the service technicians were required to remain at work waiting for repair customers and performing other nonrepair tasks. (*Id*. at p. 42.) The plaintiff class contended the employer violated minimum wage laws by failing to pay at least minimum wage for the hours the service technicians spent waiting or performing nonrepair tasks. (*Ibid.*) Like the wage order here, the wage order in issue in *Gonzalez* required that an employer pay its employees at least the minimum wage "for all hours worked … whether the remuneration is measured by time, piece, commission, or otherwise." (*Id.* at p. 44.) "Hours worked" was defined as " 'the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.' " (*Id*. at pp. 44–45.)

The court rejected the employer's argument that it should be allowed to average the piece-rate pay for repair work over all the hours worked to determine whether the employee had been paid at least minimum wage for all hours worked, and to supplement the amount paid if it fell short of compensating at minimum wage for all hours worked. (*Gonzalez, supra,* 215 Cal.App.4th at pp. 40–41.) The court concluded that, because the wage order required payment of at least minimum wage for all hours worked, the employer could not average the piece rate, which compensated only for time spent doing

repair work, over all the hours worked, including time spent waiting for repair work or performing nonrepair work, because the result would be payment at less than the agreed rate for the hours spent on repair work. (*Id*. at pp. 40, 45–48.) It distinguished federal cases, which approved averaging of wages, based on differences in California and federal wage laws. (*Id*. at pp. 47–48.)

Plaintiffs contend *Gonzalez* requires an employer who compensates its employees on a piece-rate basis to "also compensate them at a separate hourly rate for time spent performing tasks that are not incidental to the piece rate." They contend common issues on this claim predominate, including whether defendant must compensate the putative class for "tasks not directly compensated by the piece rate," such as inspections, delays, and paperwork. They assert the predominant factual question on this claim was resolved by defendant's admission that it did not separately compensate for these tasks.

We note that the *Gonzalez* decision was issued in 2013, and discussed existing federal authority that approved averaging the piece rate over all hours worked to determine if minimum wage requirements were met. The proposed class period began in 2010. Plaintiffs assume the legal issue is a common issue, without discussing whether the law remained the same throughout the class period. Plaintiffs have not discussed the state of the law on this issue prior to *Gonzalez*.

Additionally, contrary to plaintiffs' assertion, the predominant factual issue is not resolved by defendant's acknowledgement that it did not separately pay its drivers for specific items such as inspections, delays, and paperwork. As plaintiffs formulate the legal issue, this case presents the question whether defendant "is required by California law to pay drivers separately for tasks not directly compensated by the piece rate." Thus, the initial factual question is: what tasks were directly compensated by the piece rate? The admissions plaintiffs rely on do not answer that question.

The trial court found defendant's drivers fell within a number of categories, including those who picked up milk from dairies and delivered it to creameries, and those

14.

who transported cattle, hay, or other items.  The milk drivers worked for two different customers, CDI and DFA.  Different pay formulas applied to different customers and different loads.  The evidence showed most drivers were paid by the load; generally, they were paid a percentage of what defendant was paid for the load.  CDI milk drivers, however, were paid a daily rate, plus an hourly rate for some of their waiting time, and an additional amount per load for loads over four in a day.  Drivers hauling different products transported different numbers of loads per day; some hauled products long distances over multiple days.

Both named plaintiffs testified they were milk drivers, primarily for DFA.  Both quit working for defendant in 2011.  In support of the motion for class certification, in addition to their own testimony, the named plaintiffs presented the declarations of three other DFA milk drivers and one CDI milk driver.  In opposition, defendant presented deposition and declaration testimony of Petty, the named plaintiffs, and five other drivers, including a hay driver, a cattle driver, and a commodities driver.

The evidence showed the DFA milk drivers were compensated on a piece-rate basis, being paid a set amount for each load delivered.  On a daily basis, they picked up their paperwork and truck at the yard, performed a pretrip inspection of the truck, and filled out paperwork.  They drove to the assigned dairy to pick up the first load.  They picked up a loaded milk tanker or waited their turn to load one.  After loading, the drivers had the truck weighed, completed paperwork, then drove to the creamery to deliver the load.  At the creamery, they followed the check-in, scale-in, and sampling procedures, then waited for the trucks ahead to finish before unloading the milk.  After unloading, they scaled out, then proceeded to another dairy for another load.  After the final load, they returned to the yard.  There, they completed paperwork, performed a post-trip inspection of the truck, and sometimes fueled or washed the truck.

A former CDI milk hauler declared he was paid $180 per day and was also paid per load, although the amount per load varied.  Like the DFA drivers, he picked up his

truck and performed a pre-trip inspection at the yard, drove to the assigned dairy, and picked up a loaded tanker or waited to load one. After loading, he scaled out, completed paperwork, and drove to the creamery. There, he followed the check-in, scale-in, and sampling procedures, waited for the trucks ahead to finish, then unloaded the milk. He scaled out and proceeded to another dairy for the next load. After the final load, he returned to the yard, where he performed a post-trip inspection, completed paperwork, fueled the truck, and often washed it.

A current CDI milk driver declared he is paid $180 per day, regardless of loads completed. If required to wait at a creamery more than one hour, he is compensated $10 per hour for the additional wait time. Further, for every load over four he delivers in a day, he is paid an additional $45 to $60, depending on the distance from the dairy to the creamery.

A former hay driver declared most of his deliveries started at defendant's yard and ended in Nevada, or sometimes Idaho. He completed two or three loads per week; his trips usually involved an overnight stay. He loaded and unloaded the trailer. He was paid a percentage of what defendant received for the loads, which was usually based on the weight of the load, so the amount he was paid varied.

A commodities driver stated he generally travels between Dinuba and Traver, but has delivered loads out of state. He generally delivers three to four loads per day. He waits or takes a break while the trailer is loaded and unloaded for each delivery. He is paid different rates per load depending on the weight of the load or the distance traveled.

A cattle driver declared he hauls cattle to and from locations in 14 western states. He generally performs long hauls that take more than one day, requiring overnight stays, although he also delivers loads over shorter distances within California. He typically delivers two loads in each trip, one going and one returning. He usually completes three or four loads per week. As part of his deliveries, he loads and unloads the trailer; some loads require that he allow the cattle to exit the trailer to be fed, watered, and allowed to

rest. He is paid a percentage of the amount defendant receives for the loads, which varies based on mileage and the type of cattle transported.

Petty, as defendant's person most knowledgeable, testified defendant's drivers were paid on a piece-rate basis, a percentage of what defendant received for the load, for "pretty much 100 percent of the products." He also stated he explained to drivers, prior to hiring them, that their payment included all tasks required to complete the loads, including inspecting the trucks, filling out paperwork, loading and unloading, fueling, and returning the truck to the yard.

In *Gonzalez*, the plaintiffs were paid a flat rate for the repairs they performed. They were not paid, at a flat or hourly rate, for time spent waiting for customers for repair work or performing nonrepair tasks. After computing the individual's pay based on the repairs performed, the employer averaged that total pay amount over the total number of hours worked, including wait and nonrepair time, and determined whether the employee's compensation would satisfy the minimum wage requirements. If, during a particular pay period, it did not, the employer would supplement the individual's pay in the amount of the shortfall. (*Gonzalez*, *supra*, 215 Cal.App.4th at pp. 41–42.) In *Gonzalez*, it was clear the piece rate covered only the repair tasks, and not the wait time or nonrepair tasks. Thus, in order for the employees to be paid as agreed for the repair work, the piece-rate payment had to apply only to the repair time; to comply with the minimum wage laws, the wait and nonrepair time had to be compensated separately at an hourly rate at least equal to the minimum wage.

Here, the drivers were paid per load. There are factual issues regarding what tasks constitute a "load" for each driver or each category of drivers. Thus, there are factual issues regarding what tasks were directly compensated by the piece rate, which were not present in *Gonzalez*. The evidence presented by the parties raised factual issues regarding whether and which items other than driving were included in the piece-rate

17.

compensation for the various categories of drivers. Plaintiffs have not demonstrated that those questions present common issues that may be resolved on a class-wide basis.

Plaintiffs presented no evidence of a common or uniform agreement between defendant and all the categories of drivers in the proposed class. They presented no evidence that, under the employment contracts, the piece rate covered only driving, or excluded time spent on activities such as vehicle inspections, completing paperwork, loading, unloading, waiting at dairies or creameries, fueling, or returning to the yard. In fact, the testimony of the named plaintiffs that they had no understanding they were to be paid separately for these activities supports an inference that these activities were part of the tasks for which the piece rate was paid.

The federal cases plaintiffs cited are distinguishable. In *Cardenas v. McLane Foodservices, Inc*. (C.D. Cal. 2011) 796 F.Supp.2d 1246, the court granted summary judgment in favor of the plaintiffs, truck drivers employed by the defendant, on their claim that the piece-rate formula used by the defendant to compensate the plaintiffs failed to compensate the plaintiffs for all the time worked. (*Id*. at pp. 1249–1250, 1253.) The plaintiffs alleged they were not compensated for pre- and post-shift duties, including vehicle inspections and paperwork. (*Id*. at p. 1249.) It was undisputed that the piece-rate pay formula "consist[ed] of a calculation based on the number of cases of product delivered, the number of miles driven on a delivery route, and the number of delivery stops. [Citation.] Those components [did] not calculate for the pre- and post-shift duties." (*Id*. at p. 1253.) Thus, in *Cardenas*, there was no dispute that the employer's piece rate excluded the tasks for which the plaintiffs sought additional compensation.

In *Quezada v. Con-Way Freight, Inc*. (N.D. Cal. Oct. 15, 2012, No. C 09-03670) 2012 U.S. Dist. Lexis 148211, the court granted the named plaintiff's motion for class certification. The proposed class consisted of truck drivers, known as linehaul drivers, employed by the defendant. (*Id*. at p. 3.) The named plaintiff sought compensation for pre- and post-trip vehicle inspection time, paperwork completion, and the first hour of

wait time over the course of a shift. (*Id*. at pp. 3–4.) The court found common issues predominated because, in a prior order on the parties' motions for summary judgment, the court had already concluded "it was undisputed that linehaul drivers' compensation is calculated by multiplying a pre-set mileage rate by the number of miles in a trip. Defendant also pays drivers a separate hourly rate for work performed at Defendant's facilities, such as loading and unloading freight. However, linehaul drivers are not compensated at their hourly rate for pre-and post-trip vehicle inspection time, paperwork completion, or for the first hour of wait time over the course of a shift." (*Id*. at p. 3.) The court had also previously held that this pay scheme violated California law. (*Id*. at p. 14.) Thus, it was already determined that the piece rate paid only for the miles driven, and did not compensate for the time spent on vehicle inspections, paperwork completion, and the first hour of wait time over the course of a shift. There were no individual issues regarding what the parties agreed was included in the piece rate as there are in this case.

As the trial court observed in ruling on the motion for class certification, "it all depends upon the terms of the contract of employment." What was included in the "load" that was compensated by the piece-rate payment would depend upon the agreement of the parties. Plaintiffs failed to show any uniform agreement. They only presented declarations of milk drivers, and the CDI milk driver testified to a different payment agreement than the DFA milk drivers. Plaintiffs presented no evidence regarding the contracts of other categories of drivers, the tasks they performed in making their deliveries, or the tasks included in the piece-rate compensation for their loads. The trial court concluded plaintiffs did not show how issues regarding the scope of the tasks included in the piece rate "could be resolved without inquiry of each driver, and the persons who hired them, over a period of six years, and it does not appear that it could be determined without such individual inquiry." Substantial evidence supports the trial court's finding that individual issues predominate in plaintiffs' claim for separate

19.

compensation for "nonproductive time." Plaintiffs have not demonstrated the trial court's decision on this claim rested on improper criteria or erroneous legal assumptions.

## B. Compensation for rest breaks

Plaintiffs contend defendant is required to compensate its employees for rest breaks separately from the piece-rate payment, but it has a policy of not doing so. They seek compensation for those unpaid rest breaks.[5]

The wage order applicable to the transportation industry provides, in part: "Every employer shall authorize and permit all employees to take rest periods …. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.… Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." (Cal. Code Regs., tit. 8, § 11090 subd. (12)(A).) Plaintiffs also cite section 226.2, which provides that, "[f]or employees compensated on a piece-rate basis during a pay period, …. [¶] … [e]mployees shall be compensated for rest … periods … separate from any piece-rate compensation." (§ 226.2, subd. (a)(1).)

Plaintiffs contend defendant has a uniform policy of not separately compensating its piece-rate employees for rest periods. They argue common questions on this claim include whether the drivers were paid on a piece-rate basis, whether defendant was required to separately compensate its drivers for rest breaks, and whether defendant pays the drivers for their breaks separately from the piece rate. Plaintiffs assert that the law is clear on the second question, and that defendant admitted it paid the drivers on a piece-rate basis, but did not compensate them separately for their rest breaks.

---

[5]     Plaintiffs state: "The rest break claim is not about [defendant's] failure to provide periods of 10 or more minutes for rest. The parties agree that drivers take rest breaks. The claim is that rest breaks are unpaid and therefore not compliant with established and controlling California law."

As previously discussed, section 226.2 did not take effect until after the trial court issued its decision denying plaintiffs' motion for class certification. Prior to the enactment of that section, however, *Bluford* was decided. In *Bluford*, the trial court denied certification of a proposed class of truck drivers employed by the defendant, who claimed, among other things, that the defendant failed to pay them for rest periods. (*Bluford, supra,* 216 Cal.App.4th at p. 866.) Pursuant to a collective bargaining agreement, the employees were paid mileage rates for trips taken, fixed rates for certain tasks, an hourly rate for certain other tasks, and an hourly rate for delays. (*Id*. at p. 867.) The named plaintiff argued the employer's policies and procedures applied uniformly to all drivers, and the drivers were not paid for their rest breaks under the defendant's compensation system. (*Id*. at p. 870.)

The reviewing court reversed the denial of class certification, finding these common issues predominated over individual issues. (*Bluford*, *supra*, 216 Cal.App.4th at p. 871.) It rejected the defendant's argument that payment for the rest periods was built into the mileage rates negotiated in the collective bargaining agreement. (*Id*. at pp. 871–872.) The court stated: "[R]est periods must be separately compensated in a piece-rate system. Rest periods are considered hours worked and must be compensated. [Citation.] Under the California minimum wage law, employees must be compensated for each hour worked at either the legal minimum wage or the contractual hourly rate, and compliance cannot be determined by averaging hourly compensation." (*Id*. at p. 872.) None of the components of the employer's pay scheme directly compensated for the rest periods, and the employer was precluded from building compensation for rest breaks into its piece-rate formula. (*Id*. at pp. 872–873.)

*Bluford* was decided in 2013. It provided case authority indicating piece-rate employers were required to compensate employees for rest breaks separate from and in addition to the piece rate. *Bluford* held that, when an employee is paid on a piece-rate basis, separate compensation for rest breaks is required regardless of what the individual

21.

employment contract provides. (*Bluford*, *supra*, 216 Cal.App.4th at pp. 872–873.) Petty testified defendant's employees were paid on a piece-rate basis. He also admitted the employees were not paid separately for rest breaks; payment for rest breaks was built into the piece rate. Unlike the issue of compensation for nonproductive time, at least as to claims arising after the decision in *Bluford*, the issue of compensation for rest breaks does not involve individual questions regarding the drivers' employment contracts with defendant.

The trial court did not separately analyze the issue of compensation for rest breaks, but included rest break claims in its discussion of the nonproductive time issue. Accordingly, we conclude the trial court based its decision on the certification motion in part on an erroneous legal assumption that the law applicable to compensation for rest periods was the same as that applicable to compensation for "nonproductive time," and on its resulting conclusion that both issues presented primarily individual questions not appropriate for determination on a class basis.

Plaintiffs also contend defendant failed to pay its employees premium wages for days when the employees were not provided paid rest breaks. Section 226.7 provides that, if an employer fails to provide a rest period in accordance with the applicable statute or wage order, the employer must pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday the rest period was not provided. This presents the question whether providing a rest break, but failing to separately compensate the employee for it at an hourly rate, violates section 226.7 and requires the employer to pay premium wages for each day this occurred. That legal question may be common for all putative class members, at least for the time period after the decision in *Bluford*.[6]

---

[6]    We note, however, that section 226.7 was amended during the class period, and the section may apply to class members differently depending on when they were employed and when their claims arose. The parties have not addressed this issue.

Plaintiffs contend Petty admitted defendant never paid premium wages for failing to provide *paid* rest breaks. The portion of the record they cite, however, only concerned whether defendant paid premium wages when a rest period was *not authorized or permitted*. Plaintiffs admit drivers took rest breaks, and concede that whether rest breaks were authorized or permitted is not an issue in this case. Consequently, the evidence plaintiffs point to does not address whether the factual issues raised by the claim for premium wages for *failure to compensate for rest breaks* may be determined on a class-wide basis.

In sum, at least as to claims arising after the decision in *Bluford*, plaintiffs' claims for separate compensation for rest breaks presented some common factual and legal issues that the trial court should have considered as common questions, capable of being determined on a class basis, when it considered whether common issues predominate in this case. The claim for premium wages may also present a common legal question regarding whether section 226.7 requires payment of premium wages when an employee paid on a piece-rate basis is provided a rest break, but is not compensated for the break separately from the piece rate. Because the trial court based its decision on the certification motion in part on an erroneous legal assumption, and failed to consider the common questions presented by the rest break claims, we must remand for the trial court to reconsider whether common issues predominate in the case as a whole.

### C.    Meal break claims

The wage order applicable to the transportation industry provides, in pertinent part:

> "(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes .…
>
> "(B) An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than 30 minutes, .…

"(C) Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

"(D) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided." (Cal. Code Regs., tit. 8, § 11090, subd. (11)(A), (B), (C), (D).)

An employer satisfies the requirement of providing an off-duty meal period if it relieves the employee of all duty for the designated period; the employer need not ensure that the employee does no work during that time. (*Brinker*, *supra*, 53 Cal.4th at p. 1034.)

Plaintiffs bring the following claims regarding meal breaks: (1) class members were not provided a meal period within the first five hours of work and a second meal period after ten hours of work; (2) they were not provided a meal period of at least 30 minutes; (3) they were not provided an off duty meal period or payment for an on duty meal period; and (4) they were not paid a meal period premium when an off duty meal period was not provided.

Plaintiffs assert that, prior to April 2014, defendant had a uniform meal period policy applicable to all drivers that drivers were required to take a meal break after eight hours of work. After that date, drivers were required to take a meal break after six hours of work. Plaintiffs also contend defendant had a policy of not permitting a second meal break for shifts lasting more than 10 hours. Petty testified to the former eight-hour and current six-hour policies, but did not testify that defendant had a policy of not permitting a second meal break during a shift of over 10 hours. He also qualified his testimony by stating that "[t]here was no forced meal break or expected meal break, but drivers are permitted to take as many breaks during the day as required for their convenience." The driver declarations submitted by defendant, including those of the cattle, hay, and

24.

commodities drivers, agreed they were free to take meal breaks whenever they wanted and could take as many breaks as they wanted or thought necessary.

There was conflicting evidence regarding whether the drivers were provided off duty meal periods. The declarations of milk drivers submitted by plaintiffs stated the declarants were on duty the entire time they were with the truck, even while waiting in line to load or unload, and while loading and unloading, and they were not given off-duty time for meal breaks. Petty testified the drivers were on duty from the time they started the day until they were relieved of responsibility, but they were relieved of duty at the milk plants; there, the keys would be taken from the drivers while the trucks were being unloaded, and the drivers were free to have lunch in the break rooms provided. Two milk drivers whose declarations defendant provided stated they usually took their meal breaks at the creameries during unloading. Plaintiffs presented no evidence drivers other than the milk drivers were not relieved of duty during meal periods.

The trial court concluded that, in the absence of the releases, the meal break issues could be determined on a class basis as common issues of law; however, if the releases are valid, these claims would be precluded. The implication of this finding is that the meal period claims of the subclass of drivers who did not sign releases presented common issues of law unaffected by the release defense. The trial court reached this conclusion despite conflicting evidence regarding whether meal breaks were permitted only after a certain number of hours of work, or whether they were permitted any time the employee needed one. The uncontradicted evidence of drivers other than milk drivers indicated the latter policy applied to them. That policy would give rise to individual issues, such as whether the employee took a meal break, whether the employee was relieved of duty at the time, and, if no break was taken, whether the employee omitted the meal break by choice.

On appeal from an order denying class certification, we review only the trial court's stated reasons for the denial. (*Hendershot*, *supra*, 228 Cal.App.4th at p. 1221;

25.

*Bufil, supra*, 162 Cal.App.4th at p. 1205.)  It found common legal issues in the meal break claims.  It did not discuss any release issues related to the meal break claims, or determine whether the releases, as they applied to meal break claims, presented predominantly common or individual questions.  It did not expressly find that individual issues predominated over common issues as to the meal break claims, because of individual issues raised by the releases.  Nonetheless, it seemed to find that the effect of the releases was to overcome the common issues presented by the meal period claims.  Consequently, the trial court's findings and reasoning regarding the meal period issues do not support its denial of the motion for class certification; we must remand for the trial court to consider the common issues it found, and any individual issues presented by the meal break claims or the releases of those claims, in determining whether common issues predominate in the case as a whole.[7]

### D.    Releases

In determining whether common issues predominate, "[t]he affirmative defenses of the defendant must also be considered, because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues."  (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 941.)

The trial court rejected plaintiffs' contention the releases signed by some of the drivers were categorically invalid because they were void under section 206.5.  That

---

[7]    After oral argument, defendant provided the court with a recent determination by the Department of Transportation, Federal Motor Carrier Safety Administration, that the federal hours of service regulations applicable to interstate motor carriers preempt California's meal and rest break laws and regulations, as applied to drivers of interstate motor carriers.  (Docket No. FMCSA-2018-0304.)  This determination supports the trial court's finding that the case also presents non-common issues of federal preemption, applicable to only some of the drivers in the proposed class, i.e., the interstate drivers.  These issues should be considered by the trial court on remand, in redetermining whether common issues predominate in the case as a whole.

section provides in part: "An employer shall not require the execution of a release of a claim or right on account of wages due … unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee." (§ 206.5, subd. (a).)

In *Chindarah v. Pick Up Stix, Inc.* (2009) 171 Cal.App.4th 796 (*Chindarah*), an action in which two former employees of the defendant sought to recover unpaid overtime wages in a proposed class action, the court addressed the effect of section 206.5 on the releases signed by some of the proposed class members. (*Chindarah*, *supra*, at p. 798.) The plaintiffs contended the releases were void under section 206.5 as a matter of law, to the extent they released claims for any wages actually due and unpaid; they argued wages actually due included wages that were disputed, if they were ultimately found to be owing. (*Chindarah*, *supra*, at p. 799.) The court rejected that interpretation. It applied the rule established by prior case law that an employer and employee may compromise a bona fide dispute over wages, as long as wages that are concededly due have been unconditionally paid. (*Id*. at p. 800.) Because the releases settled a bona fide dispute over whether the employer had violated wage laws, and did not condition the payment of wages concededly due on execution of the releases, the court held the releases validly barred the claims of the employees who had signed them. (*Id*. at p. 803.)

Similarly, in *Watkins v. Wachovia Corp*. (2009) 172 Cal.App.4th 1576 (*Watkins*), the court considered whether an employee's release of claims against her employer was invalidated by section 206.5. The plaintiff argued section 206.5 prohibited "the release of *any* claim for unpaid wages unless payment in full of *all* claimed wages" was made. (*Watkins, supra,* at p. 1586.) The defendant argued section 206.5 had to be read in conjunction with section 206, which provided: " 'In case of a dispute over wages, the employer shall pay, without condition … all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed.' " (*Watkins, supra,* at p. 1586.) The court cited *Chindarah* for the

27.

proposition that section 206.5 "simply prohibits employers from coercing settlements by withholding wages concededly due. In other words, wages are not considered 'due' and unreleasable under [section] 206.5, unless they are required to be paid under [section] 206. When a bona fide dispute exists, the disputed amounts are not 'due,' and the bona fide dispute can be voluntarily settled with a release and a payment—even if the payment is for an amount less than the total wages claimed by the employee." (*Watkins*, *supra*, at p. 1587.)

The trial court concluded plaintiffs' assertion that the releases were categorically invalid under section 206.5 was based on an assumption that the wages they claimed were in fact due and unpaid. Under *Chindarah* and *Watkins*, however, the primary question presented by the release defense was whether there was a bona fide dispute as to wages due, which could validly be settled by the settlement and release agreements. In their motion for class certification, plaintiffs assumed their interpretation of the employment contracts was correct and undisputed: that the drivers' employment contracts uniformly excluded from the piece-rate compensation any amount for rest breaks and the tasks plaintiffs described as "nonproductive time." The trial court concluded the issue of what wages were due required consideration of the drivers' employment contracts and a determination of what tasks were included in the piece-rate compensation; it found that issue raised individual questions regarding each driver's employment contract that could not be resolved without the testimony of the individual drivers. Thus, the trial court found the release defense raised the same individual questions regarding the terms of the drivers' employment contracts as the nonproductive time claims.

Contrary to plaintiffs' contention, the trial court did not adjudicate the question of the validity of the releases in its ruling on the class certification motion. Instead, the trial court simply concluded that the validity of the releases depended upon whether there was a bona fide dispute regarding whether wages were owed, and consideration of that

question would involve review of the drivers' employment contracts with defendant. Plaintiffs' evidence did not establish that all the drivers, or even all the drivers in each category of drivers, entered into employment contracts containing the same compensation provisions. Therefore, the trial court concluded determination of the validity of the releases would require consideration of individual questions regarding each drivers' employment contract with defendant.

On appeal, plaintiffs contend "there is really a single question that needs to be determined to adjudicate the validity of the releases: does [defendant] have a bona fide dispute as to its obligation to pay *rest breaks* separately?" (Italics added.) Plaintiffs seem to argue there can be no good faith dispute about wages when there is clear statutory or case authority requiring that they be paid a certain way, but the employer does not pay in that way. Here, they assert, statutory and case law required that compensation for rest breaks must be paid at an hourly rate in addition to the piece rate, and there could be no good faith dispute about that requirement. Plaintiffs conclude that, because hourly wages for rest breaks were undisputedly due, and defendant admitted it included payment for rest breaks in the piece rate rather than compensating for them separately at an hourly rate, there was no good faith dispute about the rest break compensation and the releases were therefore entirely invalid. Plaintiffs argue the trial court's finding that the releases do not present common issues was based on a legal error: that defendant could lawfully incorporate payment for rest breaks into its piece rate, giving rise to individual factual questions about whether each driver's employment contract did so.

In *Maldonado v. Epsilon Plastics, Inc*. (2018) 22 Cal.App.5th 1308 (*Maldonado)*, the court considered the meaning of the term "good faith" in the context of an award of waiting time penalties for the employer's failure to pay employees all the wages due them on termination. (*Id*. at pp. 1323–1324, 1331–1332.) Under section 203, if an employer willfully fails to pay an employee all wages due when the employee is discharged or

29.

quits, the employee's wages continue as a penalty for up to 30 days. (*Maldonado*, *supra*, at p. 1331.) The regulation defining "willful failure to pay wages" stated that a good faith dispute that any wages are due precludes imposition of the penalty. (*Ibid*., citing Cal. Code Regs., tit. 8, § 13520.) Further, " '[a] "good faith dispute" that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recover[y] on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a "good faith dispute." ' " (*Maldonado*, *supra*, at pp. 1331–1332.) The court noted the regulation imposed an objective standard, and "[c]ourts have found good faith disputes in a failure to pay wages when the legal duty to pay the wages was unclear at the time of the failure to pay." (*Id.* at p. 1332.)

Although we found no error in the trial court's determination that the issue of compensation for "nonproductive time" presented individual issues concerning the drivers' employment contracts with defendant, we also concluded the trial court based its denial of the motion on an erroneous assumption to the extent it failed to separately consider whether plaintiffs' rest period claim presented common issues suitable for class-wide consideration. Likewise, in considering the effect of the releases and whether they presented issues common to the proposed subclass of members who signed them, the trial court failed to consider the issues raised by the rest break claims.

Under sections 206 and 206.5, and the *Chindarah* and *Watkins* cases, the releases would be valid only if they settled a good faith dispute regarding the wages to which the settling drivers were entitled. Regarding the rest break claims, plaintiffs assume the legal issue is common to all members of the release subclass. They assert defendant could not lawfully incorporate rest breaks into the piece rate. The statute they cite as one basis for the rule, however, did not take effect until after the proposed class period. The case they

rely on was not issued until 2013, in the midst of the proposed class period. If, as *Maldonado* suggests, a good faith dispute about wages may exist when the legal duty to pay the wages was unclear at the time of the failure to pay them, and if the rule requiring compensation for rest breaks in addition to the piece rate was not established or was not clarified until *Bluford* in 2013, then the legal and factual issues raised by the releases may depend upon when the individual rest break claims arose; they may not be common to all subclass members.

Additionally, plaintiffs maintain the releases were unconscionable. " 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc*. (2015) 232 Cal.App.4th 1332, 1346.) "The formulation contains both a procedural and a substantive element." (*Ibid*.) The procedural element addresses the circumstances of contract negotiation and formation. (*Id*. at p. 1347.) This includes analysis of whether the contract is one of adhesion (a standardized contract imposed and drafted by the more powerful party, that gives the signing party only the option of adhering to it or rejecting it) and the circumstances surrounding negotiation and formation of the contract (including the time allowed to consider the proposed contract, any pressure exerted on the party to sign the contract, the complexity of the provisions, the education and experience of the signing party, and whether the signing party had an attorney review the proposed contract). (*Id*. at pp. 1348, 1350.) The substantive element is concerned with the fairness of the agreement's terms and whether they are overly harsh, so one sided as to shock the conscience, or unreasonably favorable to the more powerful party. (*Id*. at pp. 1347, 1349.) Both elements must be present in order for a contract to be deemed unconscionable. (*Id*. at p. 1347.)

Plaintiffs contend defendant had one of its office employees, Heredia, contact defendant's former drivers and ask them if they wanted to read and sign the release

agreements; Heredia told the former drivers that defendant would give them $50 for the time they spent reading the document. The evidence plaintiffs cite indicates Heredia contacted only six or seven former drivers, and others in the office were also instructed to contact former drivers about the releases; the office employees were not given a script to follow in speaking to the former drivers, but put it in their own words. Heredia also testified she did not tell the former drivers they should sign the release. Other evidence indicated Petty or the company dispatcher obtained some of the releases, after speaking with the drivers about signing them and telling the drivers they did not have to sign. Petty also told the drivers they could take the release home to think about it before signing; some drivers did so, others read and signed the release immediately.

The unconscionability claim presents factual issues regarding the circumstances under which the releases were executed. These include whether the drivers were compelled or pressured to sign, or were given a choice to sign or not sign the releases; whether they were given time to read and consider the releases before signing them; whether the terms of the agreements were clear and understandable; whether the drivers were able to or did understand the releases; and whether the terms were unreasonably one-sided or unfair to the drivers. The trial court's determination that the unconscionability issues are predominantly individual is supported by substantial evidence.

## V.     Numerosity

"To be certified, a class must be 'numerous' in size such that 'it is impracticable to bring them all before the court … .' " (*Hendershot*, *supra*, 228 Cal.App.4th at p. 1222.) No set number of class members is required. " 'The ultimate issue in evaluating this factor is whether the class is too large to make joinder practicable,' " in other words, whether it would be difficult or inconvenient to join all members of the class as plaintiffs. (*Ibid*.) " 'In addition to the size of the class, the court may also consider the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and

32.

any other factor relevant to the practicability of joining all the putative class members.' " (*Ibid.*)

On the claims for compensation for rest breaks and nonproductive time, after finding there were no common issues as to the subclass of drivers who executed releases, because determining the validity of the releases would require consideration of each driver's employment contract, the trial court concluded plaintiffs failed to show how the claims of the remaining proposed class members could be resolved on a class basis. It added that plaintiffs had "also failed to show that the remaining persons in each pay category would be sufficiently numerous to make class determination preferable."

Plaintiffs argue the trial court erred in determining numerosity based only on the number of putative class members who did not sign releases. They assert that by doing so the trial court effectively adjudicated the issue of the validity of the releases and eliminated those who signed releases from the class. As discussed previously, however, the trial court did not adjudicate the validity of the releases. It found that the issues related to the validity of the releases presented predominantly individual questions, making the claims of the subclass of drivers who signed releases unsuitable for class treatment. It applied that finding by excluding those drivers from further consideration because of the predominantly individual release issues, not because it determined the releases were valid. It found plaintiffs failed to show the remaining putative class members—the proposed subclass of drivers who did not sign releases—were sufficiently numerous to warrant litigation on a class basis.

We conclude the trial court had discretion to consider whether the remaining members of the proposed class were sufficiently numerous to justify class treatment, after determining individual questions predominated with respect to the claims of one subclass and the defense to them. However, because we have found that the trial court used improper criteria or erroneous legal assumptions in determining whether common issues predominate in the rest break claims, and that the error in considering the rest break

33.

claims affected the trial court's analysis of the meal break and release claims, we conclude the trial court must reconsider numerosity along with the other factors and redetermine whether class certification should be granted.[8]

## VI. Superiority of Class Adjudication

Class actions are an important means of preventing a failure of justice in our judicial system. (*Linder, supra,* 23 Cal.4th at p. 434.) By providing a procedure for resolving the claims of many individuals at once, class actions eliminate repetitious litigation and provide small claimants with a method of obtaining redress. (*Id*. at p. 435.) "Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Ibid*.) "Because a class should not be certified unless 'substantial benefits accrue both to litigants and the courts' [citation], the question arises as to whether a class action would be superior to individual lawsuits." (*Basurco v. 21st Century Ins. Co*. (2003) 108 Cal.App.4th 110, 120.)

The trial court recognized: "The basic determination in class certification is whether a class action is the superior method of adjudicating Plaintiffs' claims. This depends upon whether the class is sufficiently numerous, and whether there is a well-defined community of interest, in which issues capable of being determined on a class wide basis predominate over issues requiring individual adjudication." After analyzing

---

[8] We need not consider the elements of typicality and adequacy of representation, i.e., whether the claims of the named plaintiffs and proposed class representatives are typical of the claims of the putative class members and whether the proposed class representatives can adequately represent the class. In reviewing an order denying class certification, we consider only the reasons cited by the trial court for its decision (*Bufil*, *supra*, 162 Cal.App.4th at p. 1205), and the trial court's decision did not address those elements.

the issues discussed above, the trial court concluded that a class action would not be the superior means of resolving the claims presented. The trial court gave two reasons for this decision: "Given the paucity of common issues capable of being determined on a class basis, and the lack of information as to the potential numbers of actual persons in the numerous categories, a class action is clearly not the superior method of adjudication [of] the claims in this action."

"The appeal of an order denying class certification presents an exception to the general rule that a reviewing court will look to the trial court's result, not its rationale. If the trial court failed to follow the correct legal analysis when deciding whether to certify a class action, 'an appellate court is required to reverse an order denying class certification . . ., "even though there may be substantial evidence to support the court's order." ' " (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828.) This standard of review requires that the trial court articulate some reason or basis for denial of class certification from which the reviewing court can determine the soundness of the trial court's decision. (*Tellez v. Rich Voss Trucking, Inc*. (2015) 240 Cal.App.4th 1052, 1065.) On appeal, "we must determine whether the trial court engaged in correct legal analysis." (*Caro v. Procter & Gamble Co*. (1993) 18 Cal.App.4th 644, 655.)

The trial court's first reason for finding a class action was not the superior method of adjudicating plaintiffs' claims was the "paucity of common issues capable of being determined on a class basis." That conclusion, however, was influenced by the trial court's erroneous legal assumptions about the rest break claims, the effect of that error on the analysis of other claims, and shortcomings in its analysis and reasoning on the meal break claims, as discussed previously.

The trial court's second reason for denying class certification was "the lack of information as to the potential numbers of actual persons in the numerous categories." That reason was not supported by substantial evidence, because there was evidence as to the number of drivers within each category of drivers, and within each proposed subclass.

35.

Additionally, the trial court's discussion of the numerosity issue did not include any consideration of the impracticability, difficulty, or inconvenience of joining all the proposed class members, or all the proposed nonrelease subclass members, in the action. (*Hendershot*, *supra*, 228 Cal.App.4th at p. 1222.) Thus, it did not appear to apply the correct analysis in considering numerosity.

Because of the trial court's use of improper criteria or erroneous legal assumptions and other errors in the resolution of the motion, we must reverse the order and remand for the trial court to reconsider the motion for certification of the proposed class and subclasses.

## DISPOSITION

The trial court's order denying class certification is reversed and the matter is remanded to the trial court to reconsider and redetermine the motion for class certification in light of the views expressed in this opinion. Plaintiffs are entitled to their costs on appeal.

_____

HILL, P.J.

WE CONCUR:


_____

POOCHIGIAN, J.


_____

SMITH, J.

36.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FERNANDO JIMENEZ-SANCHEZ et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DARK HORSE EXPRESS, INC., <br><br> Defendant and Respondent. | F072599 <br><br> (Tulare Super. Ct. No. VCU255684) <br><br> **ORDER GRANTING REQUEST FOR PUBLICATION** |

As the nonpublished opinion filed on January 16, 2019, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

_____

HILL, P.J.

WE CONCUR:


_____

POOCHIGIAN, J.


_____

SMITH, J.